IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ISIDRO TAMEZ, JR, | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-cv-3097 |
| | § | |
| CITY OF HOUSTON, TEXAS | § | |
|     Defendant | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Isidro Tamez, Jr. ("Plaintiff" or "Tamez"), and files this Complaint against Defendant, City of Houston, Texas ("City of Houston," "HFD" or "Defendant"), and for his causes of action, would show as follows:

## INTRODUCTION

1.     This action seeks equitable relief, compensatory damages, punitive damages, attorney's fees, expert witness fees, taxable costs of court, pre-judgment and post-judgment interest for retaliation and discrimination on the basis of race and national origin, suffered by Plaintiff in the course of his employment with Defendant.

2.     Defendant's retaliatory and discriminatory conduct towards Plaintiff was in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

3.     Plaintiff demands a jury on all issues triable to a jury

## PARTIES

4.     Plaintiff, Isidro Tamez, Jr. ("Tamez"), is an individual and a resident of Houston, Harris County, Texas.

5.     Defendant, City of Houston, Texas ("The City"), is a governmental entity.   The City of Houston employs Plaintiff.   Service of the Summons and this Complaint may be made by serving Anna Russell, its City Secretary, at 900 Bagby Street, Houston, Texas 77002.

6.     Whenever in this Complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.* and the Texas Commission on Human Rights Act, codified under the Tex. Lab. Code §§ 21.001 *et seq.*

8.     This is a civil action over which this court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3) and (4).

9.     The Court has personal jurisdiction over Defendant since it regularly conducts business in the State of Texas, and therefore has minimum contacts with the State of Texas.

10.     Alternatively, the Court has personal jurisdiction over Defendant since the acts giving rise to this suit occurred within the State of Texas.

11.     Venue is proper in the Southern District of Texas, under 28 U.S.C. § 1391(b) since a substantial part of the events or omissions giving rise to this cause of action occurred in the Southern District of Texas.

12.     This Court has jurisdiction over all claims in this action.

13.     All conditions precedent to filing this cause of action have been met.

14.     This Court has jurisdiction over all claims in this action.

15.     All conditions precedent to filing this cause of action have been met.

### CONDITIONS PRECEDENT TO SUIT

16.     Plaintiff filed a complaint of discrimination against Defendant under Charge Number 460-2010-01614 with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC-CRD") on or about February 23, 2010.

17.     Plaintiff supplemented this charge on or about April 8, 2011.

18.     Plaintiff filed a second supplement of this charge on or about July 7, 2014.

19.     Tamez's first EEOC charge (460-2010-0164) was investigated by the EEOC and it issued a finding in Tamez's favor.

20.     Tamez's first charge went to EEOC conciliation and was turned over to the Department of Justice ("DOJ") based on communications from the EEOC.

21.     The City of Houston withdrew from conciliation.

22.     On or after September 13, 2017, the United States Department of Justice issued a Notice of Right to Sue letter entitling Plaintiff to file an action in this Court for his claims in his 2010 Charge.

23.     This action is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue Letter from the Department of Justice.

24.     Plaintiff filed a complaint of discrimination against Defendant under Charge Number 460-2016-01252 with the EEOC and the TWC-CRD on or about January 21, 2016.

25.     The EEOC referred this matter to the DOJ since the first Charge was also under DOJ control and review.

3

26.     On or after July 18, 2017, the DOJ issued a Notice of Right to Sue letter entitling Plaintiff to file an action in this Court for his claims in his 2016 Charge.

27.     This action is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue Letter from the EEOC/DOJ.

## FACTS

28.     Plaintiff is a Hispanic male firefighter.

29.     Tamez was employed at all times relevant at the Houston Fire Department ("HFD") located at 1205 Dart St., Houston, Texas 77007.

30.     HFD is a division within the City of Houston and the employees of the HFD are employees of the City of Houston.

31.     Tamez started his training to be a firefighter for HFD in 1984.

32.     At the time Tamez filed his first EEOC charge, he was a senior captain stationed at the Houston Fire Academy.

33.     Tamez had previously been stationed at Fire Station 81 (Hobby Airport-ARFF) from September 2003 through October 2006.

34.     Tamez had been stationed at Fire Station 54 (Bush-Intercontinental Airport -ARFF) from October 2006 to January 2010.

35.     In 2004, while stationed at Station 81, an incident occurred during Tamez's assigned shift when Engineer/Operator (E/O) Sharon Branch ("Branch") (African-American female) was taking Tamez's place in the position of Acting Captain because Tamez was absent that day.

36.     Upon Tamez's return to work, Branch informed Tamez of an incident where during an aircraft emergency response Branch had to leave her command vehicle and enter two separate

4

fire trucks in order to turn on their mobile radios so that she could communicate orders to the drivers.

37.     The male firefighters had turned off their radios because they did not want to take orders from an African-American female.

38.     Captain Tamez addressed this issue with the crew members involved to ensure that it did not happen again as it was not only discriminatory conduct, it was a safety issue.

39.     District Chief George McAteer ("McAteer") and Senior Capitan Hoyt ("Hoyt"), who were Tamez's superiors, were called by someone at the station after Tamez addressed the issue with those crewmembers.

40.     McAteer and Hoyt showed up at Tamez's station after they received the call from someone at the station to talk to Tamez.

41.     McAteer and Hoyt ordered Tamez to discipline Branch and attempted to pressure Tamez to make a negative entry in her personnel file instead of disciplining the drivers of the other two trucks for turning off their radios during an emergency.

42.     When Tamez asked for the reason for the documentation, no reasonable explanation was given. Thus, Tamez made the decision not to carry out the request on the basis that the order was improper and obviously discriminatory against Branch.

43.     When Tamez refused to carry out McAteer and Hoyt's improper disciplinary action against Branch, Hoyt threatened Tamez stating if he didn't discipline Branch, "something bad is going to happen."

44.     It was clear Hoyt intended that statement to be a threat that if Tamez did not carry out the order, that Tamez's career would be adversely affected.

45.     The next year, in February 2005, McAteer, along with Hoyt, visited Station 81 and ordered Tamez not to delegate any of Tamez's administrative duties to the Engineers/Operators assigned to Tamez's shift (such as Branch).

46.     The practice of delegating responsibilities is a standard of practice in fire departments and encouraged for officers in HFD and ARFF.

47.     Delegating is a training tool to prepare the E/O to be in charge when the assigned captain is out or offsite as well as develop potential captains.

48.     McAteer gave no reason as to why Tamez could no longer delegate to Tamez's subordinates, a standard function and responsibility of a captain's job.

49.     McAteer did not give this improper order to other similarly situated captains as Tamez. McAteer singled Tamez out as retaliation for Tamez opposing the Branch discrimination incident.

50.     In May 2008, at Station 54, one of Tamez's E/O's, an African American, Johnny Garrett ("Garrett"), was acting captain.

51.     Garrett, on two separate occasions, gave an order to a Caucasian firefighter on where to properly position a fire truck during a "hot fueling" incident involving an aircraft.

52.     In both cases, the Caucasian firefighter, who was the driving the truck, refused to position the truck as ordered by Garrett.

53.     Garrett filed a complaint about the insubordination with the HFD.

54.     McAteer was in charge of investigating the complaint of insubordination.

55.     Instead of disciplining the Caucasian firefighter for insubordination, McAteer charged Garrett for not being on the fire truck in complete gear.

56.     McAteer's obvious bias against Garrett because of his African-American race was a HFD policy violation. Accordingly, Tamez to file a complaint with the union.

57.     On or about the week of November 20, 2008 Tamez personally went to the Union Hall (Local 341) and spoke to Alvin White (Grievance Committee Official) ("White").

58.     At that time, Tamez requested that the Union help him with two issues concerning HFD.

59.     The first issue Tamez asked the Union to help him with was that of compensation – Tamez held a position that required him, as part of his required job duties, to perform the job of the next higher rank, yet he was not being properly compensated.

60.     The second issue Tamez asked the Union to help him with was McAteer's discriminatory behavior in handling both the Branch and Garrett incidents.

61.     A couple months after filing a complaint with the Union, on February 27, 2009, McAteer called Tamez to his office.

62.     During that phone call, McAteer harassed Tamez and made false accusations against Tamez.

63.     Comments made by McAteer during that phone call include asking Tamez "Are you scared of me?", "Do you think you're better than anyone else?" Tamez replied "No" to both questions.

64.     During that phone call McAteer also accused Tamez of being the one who had Senior Captain Joe Hays ("Hays") transferred.

65.     Tamez informed McAteer that Tamez was not responsible for Hays' transfer and Tamez was not even aware that Hays had been transferred.

66.     Tamez then stated to McAteer that he must have confused Tamez with someone else and that Tamez didn't appreciate the false accusations.

67.     Additionally, during this conversation with McAteer, Tamez expressed concern to McAteer that McAteer's past actions in the handling the Branch and Garrett incidents had undermined Tamez's authority and credibility at the fire station.

68.     On March 17, 2009, McAteer ordered Tamez to McAteer's office to elaborate on Tamez's statement that Tamez had made a month earlier during the February 27, 2009 phone call that McAteer's past actions had undermined Tamez's authority and credibility.

69.     Senior Captain Krusleski (ARFF Assistant Coordinator) ("Krusleski") was present at this meeting.

70.     Tamez reiterated the incident involving Branch (radio incident) in 2004 and the effect McAteer's actions had on Tamez's ability to command.

71.     Tamez stated to McAteer that he gave Tamez no reason to write Branch up and that she was the complainant.

72.     Tamez also reminded McAteer that no reprimand was ever issued to the two E/O's on the ARFF units who had turned off their radios in violation of policy which was the decision made by McAteer.

73.     McAteer's only response to Tamez was to state, "She [Branch] must have done something."

74.     McAteer also said to Tamez, "I thought we were friends" which implied to Tamez that McAteer expected Tamez to carry out an improper and discriminatory order for McAteer even if it was wrong simply because he thought they were "friends."

8

75.     The pattern of discrimination amongst the HFD, and its acceptance by HFD officers, continued when on July 7, 2009, at Station 54, Firefighters Jane Draycott ("Draycott") (Caucasian) and Paula Keyes ("Keyes") (African-American) and both female firefighters at Tamez's station, arrived at work to find their dorm vandalized and phrases such as "niggar lover", "die bitch", and "die niggar" written on the walls and their lockers.

76.     Upon becoming aware of this outrageous activity, Tamez immediately went to inspect the female dorm and ordered pictures to be taken as evidence of the harassment and hostile conduct.

77.     McAteer and Krusleski criticized Tamez and called him "unprofessional" for allowing pictures of the scene to be taken.

78.     When Tamez asked McAteer what else he expected Tamez to do he stated, "You should have shaken the police officer's hand when he came in the door".

79.     Shortly thereafter, both Draycott and Keyes were transferred to other stations.

80.     However, on January 7, 2010, Tamez and other captains were told by Fire Chief Boriskie ("Boriskie") that Draycott would be returning to Station 54 and that she was to be treated with the same respect that all other members should receive.

81.     At that meeting Boriskie allowed all crewmembers to voice their concerns about Draycott's return.

82.     After listening to the crewmembers' input, Boriskie reiterated that Draycott "has the legal right to return to Station 54."

83.     Present at this meeting were the Station 54 members, Boriskie, Assistant Chief Snell, Assistant Chief Longoria, McAteer, Krusleski, HFD Psychological Services representative E.J. Finney, Ph.D., and HFD Union representative Alvin White.

84.     On the evening of January 7, 2010, Captain Brian Williamson ("Williamson") came into Tamez's office and stated that he and the crew wanted Tamez to write a letter stating Draycott was not welcome back to Station 54.

85.     Tamez refused to write such a letter.

86.     After Tamez refused to write the letter, Williamson stated that if Tamez wouldn't write it, then he would.

87.     Williamson then told Tamez that Captain Alvin White, who was on the grievance committee of Local 341, had told Williamson that they could not "trust" Tamez.

88.     Tamez directed Williamson not to write any letter because, as an officer, such a letter would show discriminatory bias towards a crewmember and would be a violation of policy and the law.

89.     Tamez also reminded Williamson that Boriskie had earlier given the order that Draycott would be returning to Station 54 and was to be treated with respect given any other firefighter.

90.     Williamson's proposed action would be action against those orders, would be disrespectful, and deemed insubordination.

91.     Prior to Williamson leaving the office, Tamez reiterated that as an officer, Williamson could not write any letter showing any bias and he simply replied "Ok."

92.     Williamson disobeyed Tamez's order and wrote the letter Tamez had refused to write.

93.     On January 13, 2010, the day of Draycott's return to Station 54, the Station 54 crewmembers along with the HFD representatives who attended the meeting on January 7th were present.

94.     Williamson called a roll call to verify attendance and during that time he reached into his pocket and pulled out several folded white pages of paper.

95.     Williamson then began to read a prepared statement expressing his and the crewmembers' opposition to Draycott returning to Station 54.

96.     This letter included biased, disrespectful, and hurtful comments directed at Draycott.

97.     The HFD representatives took no action to stop Williamson and allowed him to read the entire prepared statement to Draycott in the presence of the entire station.

98.     Later that evening, Williamson called another roll call and informed Tamez that the crew wanted to discuss AR-1 (Assigned Vehicle for Senior Captain/ARFF Incident Commander).

99.     Tamez felt that any discussion regarding AR-1 should be discussed between Williamson and Tamez as officers prior to discussing it with crewmembers, as was the usual procedure.

100.    Tamez ordered Captain Williamson to meet with Tamez in the captain's office to discuss this situation.

101.    In the presence of the crewmembers, Williamson replied "No".

102.    This refusal by Williamson to obey an order from a superior was insubordination.

103.    Tamez had to restate to Williamson that it was a direct order before Williamson would go into the captain's office to discuss the situation in private.

104.    Behind closed doors Tamez stressed the fact that as officers, they should discuss station issues prior to involving the crewmembers.

105.    Tamez also stated to Williamson that his failure to obey Tamez's direct order earlier in the day by preparing a statement against Draycott was improper and potentially brought liability to all officers present at the meeting as well as the Houston Fire Department.

106.    Tamez asked Williamson why he didn't inform Tamez that he had prepared a letter.

107.    Williamson replied, "If I had told you that I had a letter you would not have let me read the letter."

108.    Tamez responded that Tamez would not have let Williamson read the letter had Tamez been informed of Williamson's intended actions.

109.    Williamson then added "I had help from other sources in preparing this letter".

110.    Tamez reminded Williamson that the Fire Chief would definitely be affected by his actions.

111.    During the meeting Williamson did not express any concerns about disciplinary actions towards him for his violation of Tamez's order in writing and reading the letter, indicating to Tamez that Williamson knew HFD would not take any action against him.

112.    Williamson was infuriated that Draycott was allowed to return to Station 54.

113.    In response, Williamson created and led an informal club which the members called the "Wolf Pack" comprised of the "Good Ole Boys" - the majority of the men at the station.

114.    This caused divisiveness between this club and the few members that did not want to be a part of his "club".

115.    Having this type of divisiveness at the station justifiably caused concern to Tamez because this compromised the effectiveness of the team since the men who were part of the "Wolf Pack" would follow Williamson's lead and potentially ignore Tamez's order, which would negatively affect the entire station.

116.    Moreover, the Wolf Pack acted discriminatorily as it would organize meetings that purposely excluded Elmer Williams (African-American) and Tamez.

117.    It was clear during these events that while Williamson's action were known by HFD, nothing was done to address this discriminatory conduct and it appeared that Williamson had the backing from several levels of officers within HFD.

118.    Both HFD upper command and the union were also involved in Williamson's Wolf Pack. HFD upper command was aware of the Wolf Pack, but took no corrective actions and refused to support Tamez in his efforts at the station to follow policy and the law.

119.    Less than a month after Draycott's return to Station 54 and the letter incident, on January 21, 2010, Tamez received a call from Assistant Chief Snell ("Snell") stating that a Command Staff decision had been made for a "change in leadership" and that Tamez would be involuntarily transferred effective January 23, 2010.

120.    Tamez was then transferred to the Firefighter Academy where Tamez was assigned to do menial jobs.

121.    These actions are a direct result of Tamez's opposition to the aforementioned discriminatory conduct over the last several years.

122.    The work there at the Firefighter Academy was less prestigious and less fulfilling than that at a fire station and did not have the preferred and more desirable working schedule that he had had when he worked at a station.

123.    In March 2010, Tamez was transferred to Station 61 holding the position of Senior Captain.

124.    As a Senior Captain, Tamez reported to District Chief William P. Little ("Little").

13

125. Immediately after transferring to Station 61, Tamez began to have problems with insubordination by Captain Arnoldo Jimenez ("Jimenez").

126. On Jimenez's first day at station 61, just prior to being introduced to the crew members, Jimenez falsely accused Tamez of being the individual who had done the wrongful acts at station 54.

127. Jimenez would also fail to follow Tamez's directions and instructed other firefighters to not follow Tamez's directions.

128. Tamez spoke with Little regarding the problem of insubordination at the station and specifically the ongoing insubordination by Jimenez.

129. Little took no action to address the violations in the chain of command.

130. After Little refused to take any action to address the insubordination by Jimenez and others at the station, Tamez filed two complaints with Houston Fire Department (HFD) Staff Services.

131. In Tamez's 2011 performance evaluation, after his filing of the complaints with Staff Services, Tamez was downgraded for "not getting along" with Jimenez.

132. When Tamez inquired as to the downgrade, Little informed Tamez that Little had "brought over" Jimenez, and that Little was holding Tamez responsible for the issues and problems between Tamez and Jimenez.

133. Specifically, Little told Tamez that Little would further penalize Tamez if Jimenez transferred out of the station by informing Tamez that "it's on you."

134. Little's stated reason for Tamez's downgraded evaluation was not correct since it was Little who had made the decision to not support Tamez and to continuously allow Jimenez to continually violate the chain of command.

14

135.    Tamez's evaluation was actually downgraded in retaliation for Tamez's complaint to HFD Staff Services and for his opposition to the ongoing retaliation regarding the occurrences at Station 54 and other discriminatory actions at HFD as stated above.

136.    Tamez's 2011 performance evaluation was given to him on or about April 23, 2012, about a month later than was required.

137.    Performance evaluations for Senior Captains are supposed to be given no later than March.

138.    Per HFD policy, a late performance evaluation is invalid and as such, should not be entered into the database.

139.    Although Tamez's 2011 performance evaluation was late, Little entered Tamez's scores into the database, against HFD policy.

140.    Tamez then filed another complaint with HFD Staff Services against Little for the retaliatory evaluation.

141.    While at Station 61, Tamez submitted an application for Assistant Chief on or about October 14, 2010 to Pat O'Gilvie ("O'Gilvie").

142.    The application was submitted timely as the deadline for applications was October 15, 2010.

143.    The Assistant Chief posting and application process was contained in Special Bulletin No. 145 dated September 29, 2010.

144.    O'Gilvie signed Tamez's name to a roster of applicants, thereby indicating Tamez had in fact applied for the position.

145.    Tamez met all the criteria listed in the bulletin.

146.    Tamez submitted the required resume.

147.    On October 28, 2010, Tamez received a letter from Fire Chief Terry Garrison advising Tamez that his application for Assistant Fire Chief and Executive Assistant Fire Chief had been removed from consideration.

148.    In the January 2011 publication of *The Houston Fire Fighter*, Chief Garrison in a Q & A indicated the Local Union 341 was involved in the selection process for Assistant Fire Chief and Executive Assistant Fire Chief.

149.    Captain Williamson and the crewmembers assigned to Station 54 had been told by Local 341 Union Grievance Representative Alvin White not to trust Tamez.

150.    The union and HFD did not approve Tamez as a candidate for Assistant Chief because it was known that Tamez would continue to oppose illegal discrimination and retaliation within HFD and would not blindly let the union or HFD dictate Tamez's actions especially if the action they wanted done was wrong, against policy, discriminatory, or illegal.

151.    Tamez's name was removed from the promotion list in further retaliation for Tamez's opposition to the discrimination of the female fire fighters at Station 54, and in particular for defending Draycott.

152.    Tamez has suffered another tangible adverse employment action in that Tamez was not promoted or even considered for promotion.

153.    These are separate and continuing violations of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C §2000e *et seq.*, and the Texas Commission on Human Rights Act and any of its amendments, as codified in the Texas Labor Code Chapter 21 *et seq.*,

154.    Shortly thereafter, in February 2013, Tamez was involuntarily transferred to Station 46.

155.    HFD's stated reason for this transfer was because Tamez had "lost control" of Station 61.

156.    In March 2013, while at Station 46, Tamez's 2012 performance evaluation from Tamez's previous supervisor, Little, was sent to Tamez's then current supervisor, District Chief Charles Julian ("Julian").

157.    In violation of HFD policy, District Chief Little did not sign Tamez's performance evaluation, making it invalid.

158.    This was the second year in a row that because of Little's actions and his violations of HFD policy, Tamez had failed to receive a valid performance evaluation as is required yearly under HFD policy.

159.    Tamez competently performed all his job duties while at Station 46.

160.    Station 46 is one of the busiest fire stations in the HFD.

161.    Busy fire stations are usually occupied by Senior Captains with lower seniority than Tamez.

162.    Busier stations are viewed within HFD as having a lesser quality of life because of the high activity at the station.

163.    As firefighters and officers gain seniority at the HFD, they usually decide to transfer to a station with fewer emergency responses.

164.    Tamez was deprived of this opportunity due to the hostile work environment and retaliatory conduct of HFD leadership.

165.    During Tamez's time at Station 46, Tamez continued to be subjected to retaliation and unwelcomed hostile conduct.

166.    Because of the hostile conditions within HFD, Tamez could not pick up overtime at other stations, resulting in a financial loss of thousands of dollars a year.

167.    In August of 2014, Tamez was one of the Captains at Station 46 D-shift, District 46.

168.    Tamez prepared a counseling form for an infraction by one of Tamez's African American firefighters, Engineer Operator Arthur White ("White").

169.    A meeting was held with White, Julian, and Captain Dwight Bazile ("Bazile"), now deceased.

170.    Both Julian and Bazile are African-American.

171.    In the meeting, while Julian and Bazile observed, Tamez was told to counsel White and have White sign a HFD Form 34—counseling form.

172.    During the counseling session, White stood up and approached Tamez and got in Tamez's face, stood over him and called him a "mother fucker" at least twice.

173.    White also refused to sign the form.

174.    Tamez asked Julian twice to relieve White from duty with pay for the insubordination and violent conduct but Julian did not respond and took no action.

175.    When the meeting adjourned, Tamez asked Julian what he was going to do about White's insubordination and actions. Julian replied "I already forgot what happened in there."

176.    On or about October 6, 2014, White filed a fraudulent complaint against Tamez as his captain relating to a fire in September of 2014.

177.    As a result of White's complaint, Tamez receiving a 15 day without pay suspension.

178.     Tamez did not receive notice of the suspension until April 17, 2015. Tamez complained to the City's Inspector General's office several times throughout the process about HFD's failure to follow procedure and issues at the stations related to the underlying events.

179.     Tamez was offered a minimal punishment with pay if he would accept the punishment without protest, which Tamez refused to accept as the complaint made by White was fraudulent.

180.     Tamez was not guilty of the allegations, and the findings, which resulted in the suspension, were false.

181.     There were some irregularities during the investigation and during the hearing afterwards. Tamez was warned by one of the investigators about the irregularities.

182.     One witness, Joseph Boening ("Boening"), asked Chief Richard Mann ("Mann") if he would confirm to Boening that Mann would not retaliate against Boening for testifying for Tamez.

183.     Mann refused to affirmatively state to Boening that Mann would not engage in retaliation against Boening, nor that Boening would not be subjected to retaliation specifically for testifying for Tamez, and as a result, Boening refused to testify as a witness for Tamez.

184.     After the retaliatory suspension, Tamez returned to his job at Headquarters.

185.     The results of the investigation, the suspension, and the transfer were in retaliation for Tamez filing a previous EEOC charge, for continuing to pursue that charge, and for Tamez's continuing actions in opposing discrimination and retaliation within HFD.

186.     In Tamez's previous approximately 30 years of service in the HFD, Tamez had never previously been disciplined or suspended before the April 2015 suspension.

187.    The City's handling of the investigation and its results are also motivated by retaliation because Tamez complained about Julian's handling of Tamez's request to have White relieved of duty with pay.

188.    While stationed at Headquarters, Fire Chief Samuel Pena assigned Assistant Chiefs Michelle McLeod and Richard Mann to the same Headquarters division that Tamez was assigned.

189.    This assignment was done intentionally and with the purpose to make the work conditions even more hostile toward Tamez.

190.    These work conditions caused an adverse effect to Tamez's health.

191.    McLeod and Mann were the decision makers primarily responsible for Tamez's involuntary transfers and suspension.

192.    Tamez asked Fire Chief Pena why he assigned these two chiefs to Tamez's division and the Fire Chief responded, "I had nowhere else to put them."

193.    Eventually, after being subjected to years of retaliation, discrimination and abuse by HFD, Tamez was hospitalized due to severe emotional distress and mental anguish.

194.    Tamez was evaluated to be in a critical state and diagnosed with PTSD and Major Depression Disorder (MDD).

195.    Eventually, on August 22, 2017, Tamez was forced to retire due to his medical condition caused by the long term retaliation, abuse and discrimination.

196.    Based on the totality of the circumstances stated above, illegal race and national origin discrimination occurred.

197.    This discrimination and retaliation has had and will continue to have a material effect on Tamez's career and ability to work.

198.    Tamez, despite properly applying for promotions for which he met all the required qualifications, was never promoted during his career beyond Senior Captain.

199.    Tamez has been harassed, retaliated against, and subjected to different terms and conditions of employment, including involuntary transfers without justification to less desirable jobs and schedules, because of Tamez's opposition to retaliation, discrimination and because of his race and/or national origin.

200.    These conditions have had a significant physical effect on Tamez and he has had to obtain medical treatment to address these issues, including anxiety, caused by the hostile work environment and actions at the HFD.

201.    Tamez's past actions and continued willingness to oppose discrimination and retaliation, to testify as a witness against certain bad actors in HFD, and Tamez's prior charge of discrimination to the EEOC and complaints to Staff Services lead to the retaliation and ongoing actions by HFD.

202.    Because of these continuing actions, Tamez has suffered tangible adverse employment actions.

203.    Before 2010 when Tamez began opposing HFD's discrimination and retaliatory conduct, Tamez's prior 26-year career as a firefighter was viewed positively by HFD.

204.    After approximately 2010 and following Tamez's opposition to the discriminatory and retaliatory actions at HFD, Tamez was viewed as the enemy by other firefighters, HFD leadership, and the Firefighters' union.

205.    Tamez's justified fear of the continuation of the retaliatory conduct directed towards him from the chain of command, the union, and other firefighters, caused Tamez anxiety

and concerns, including the loss of trust of other firefighters, which is essential in the job of a firefighter.

## RETALIATION

206.    Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

207.    During his employment, Plaintiff raised his opposition to Defendant's discriminatory conduct towards him and others based upon race, national origin, and gender.

208.    After Plaintiff complained about Defendant's conduct, Defendant engaged in activities, including, but not limited to, causing Plaintiff' to retire in retaliation for Plaintiff's complaints in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* and the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*

209.    As a result of Defendant's retaliatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in the probability will continue to suffer in the future.

210.    Moreover, as described above, Defendant acted with malice or, in the alternative, with reckless indifference to the state and federally protected rights of Plaintiff.   Accordingly, Plaintiff is entitled to an award of punitive damages as a result of Defendant's conduct.

## CAUSE OF ACTION—NATIONAL ORIGIN DISCRIMINATION

211.    Each and every allegation contained in the foregoing paragraphs are re-alleged as if fully rewritten herein.

212.    Plaintiff is a Hispanic male, and thus belongs to a group that 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e, *et seq.* and the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*, intended to protect.

213.    As described above, Defendant subjected Plaintiff to different terms and conditions of employment, because of his national origin, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.,* the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*, and 42 U.S.C. § 1981, for which Plaintiff requests damages.

214.    Other direct and/or circumstantial evidence demonstrates that Plaintiff was discriminated against because of his national origin, and that Defendant intended to discriminate against Plaintiff and terminate Plaintiff's employment because of his national origin.

215.    As a result of Defendant's actions, Plaintiff has suffered a loss of wages, both in the past and in the future, as well as emotional pain, mental anguish and a loss in benefits in the past and future.

216.    Moreover, as described above, Defendant acted with malice or, in the alternative, with reckless indifference to the state and federally protected rights of Plaintiff.   Accordingly, Plaintiff is entitled to an award of punitive damages as a result of Defendant's conduct.

## DISCRIMINATION ON THE BASIS OF RACE

217.    Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

218.    Plaintiff is a Hispanic male, and thus belongs to a group that Title VII, 42 U.S.C. § 2000e, *et seq.,* the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*, and 42 U.S.C. § 1981, intended to protect.

219.    As described above, Defendant subjected Plaintiff to different terms and conditions of employment because of his race, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*, and 42 U.S.C. § 1981, for which Plaintiff requests damages.

220.    Other direct and/or circumstantial evidence demonstrates that Plaintiff was discriminated against because of his race, and that Defendant intended to discriminate against Plaintiff Plaintiff's employment because of his race.

221.    As a result of Defendant's discriminatory actions, Plaintiff has suffered loss of wages and benefits, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in the probability will continue to suffer in the future.

222.    Moreover, as described above, Defendant acted with malice or, in the alternative, with reckless indifference to the state and federally protected rights of Plaintiff. Accordingly, Plaintiff is entitled to an award of punitive damages as a result of Defendant's conduct.

## **DAMAGES**

223.    Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

224.    Plaintiff seeks to be made whole and, as a result, requests all appropriate damages from Defendants that are allowed under relevant statutes.

225.    Plaintiff has lost compensation and benefits, for which he seeks as back pay, including wages, commissions, bonuses, benefits, promotions and any other compensation.

226.    In addition, Plaintiff demands front pay, including but not limited to any and all future lost wages, commissions, bonuses, benefits, promotions and any other compensation.

227.    Plaintiff also has suffered emotional distress and mental anguish as a result of Defendant's conduct and seeks compensation for same.

228.    Plaintiff demands attorney's fees, expert witness fees, pre-judgment and post-judgment interest, costs of court and any other damages allowed under Title VII, 42 U.S.C. § 2000e, *et seq.,* the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*, and 42 U.S.C. § 1981.

229.    Plaintiff further seeks punitive and/or exemplary damages for Defendant's willful, malicious, intentional and/or reckless discrimination and retaliation.

### ATTORNEY'S FEES

230.    In addition, as a result of the acts and omissions of Defendant, as specifically set forth herein, it was necessary for Plaintiff to secure counsel to prosecute this matter on his behalf.

231.    Plaintiff has retained the services of the undersigned counsel of record, and accordingly, Plaintiff requests reasonable attorney's fees and costs as provided by Title VII, 42 U.S.C. § 2000e, *et seq.,* the Texas Labor Code, Tex. Lab. Code §§ 21.001 *et seq.*, and 42 U.S.C. § 1981

### JURY DEMAND

232.    Plaintiff requests a trial by jury on all issues triable by a jury in this case.

### XIII.
### RELIEF REQUESTED

233.    Plaintiff respectfully prays that he be granted judgment for the following relief:

a.      For actual and, if allowed, liquidated damages, for the period of time provided by law, including appropriate backpay, commissions, bonuses and any other compensation, and reimbursement for lost pension, insurance, and all other benefits;

b.      Front pay, including commissions, bonuses, and benefits, in lieu of reinstatement;

25

c.      For compensatory damages and punitive damages as allowed by law;

d.      For attorneys' fees;

e.      For expert witness fees incurred by Plaintiff in the preparation and prosecution of this action;

f.      For pre-judgment and post-judgment interest as allowed by law;

g.      For costs of court, costs of prosecuting Plaintiff's claim; and

h.      For such other and further relief to which Plaintiff may be entitled under the relevant statutes or be justly entitled.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that after trial by jury, he be awarded the relief requested above, and all such other further relief, whether at law or in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

   /s/ Howard T. Dulmage
Howard T. Dulmage
The Law Offices of Howard T. Dulmage, PLLC
Texas Bar No. 24029526
2323 Clear Lake City Blvd.
Suite 180 MB 186
Houston, Texas   77062
Telephone:    (281) 271-8540
Telecopier:    (832) 295-5797
howard@dulmagelaw.com

ATTORNEY FOR PLAINTIFF
ISIDRO TAMEZ, JR.